**MAHONEY et al. v. UNITED STATES.**

Cr. No. 9033.

District Court, W. D. Louisiana, Shreveport Division.

Jan. 5, 1943.

Horace M. Holder, Frank S. Kennedy, and Armand Roos, all of Shreveport, La., for petitioners.

Malcolm E. Larfargue, U. S. Atty., of Shreveport, La., for respondent.

DAWKINS, District Judge.

The nature of the motion filed by the prisoners in this case and their contentions are set forth in the opinion of this court, handed down on February 20, 1942, United States v. Mahoney, D.C., 43 F.Supp. 943, 944, holding that they did not have the absolute right to be personally present in the trial of their petition "for a correction of sentence and judgment." It was decided that the motion amounted to a plea for a new trial or writ of coram nobis, based upon alleged coercion and failure to be represented by attorneys.

The matter will now be taken up on its merits. Counsel were appointed for the prisoners and advised that they might take the testimony of petitioners by deposition or affidavits. The latter course was adopted. Both prisoners had made similar affidavits to the motion when filed. The substance of their statements follows: They were arrested on July 25, 1938, in the state of Arkansas, on a farm near Pine Bluff, on warrants issued by the state authorities for Webster Parish, Louisiana, charging them with robbery on June 9, 1938, of the Minden Bank & Trust Co. of Minden, La.; the arresting officers also took into custody the wife and children of Harry Mahoney along with the two petitioners, the children being a boy aged 11 and a girl aged 9 years; the children were placed temporarily in the care and custody of their aunt, Mrs. Truman Mahoney; on July 26th of the same year, both petitioners, together with the wife of Harry Mahoney, were delivered to the Louisiana authorities and incarcerated in the Caddo Parish Jail: both were placed in a single cell in said jail, where they "discussed among themselves the circumstances of their precarious position"; that a listening device had been installed in said cell and their conversations were heard by an agent of the·F. B. I.; and on July 26, 1938, petitioners were questioned by the said F. B. I. agent about the Minden bank robbery in the Caddo Parish jail, but they maintained their innocence; the said agent threatened to charge the wives of the prisoners with violating the stolen property statute, if they did not confess, and their property would be confiscated; that the Government would relinquish all interest in the case if they plead guilty, and no charge would be placed against their wives; that "in a devious way the petitioners had heard the actual minute details of the robbery and * * * agreed between themselves to temporarily acknowledge said accusation in order to liberate petitioners' wives, and then retract said incriminating acknowledgements when brought before the Court"; that about the same date, July 26, 1938, assistant U. S. Attorney, J. Fair Hardin, interviewed petitioners, and insisted that Truman Mahoney deed to said assistant district attorney a farm near Thornburg, Arkansas, as security for what was stolen from the Bank; and on July 27, 1938, read to them the Federal statutes covering bank robbery, and if they did not transfer this property and plead guilty, they would get 25 years in a penitentiary; that if they plead guilty in the state court "the Federal authorities will be satisfied"; that petitioners were first arraigned in the state court, but after these threats were made by the F. B. I. agent and Assistant U. S. Attorney, they plead not guilty; on October 11, 1938, they "capitulated by interposing a plea of guilty to said robbery accusation on a promise that in the morning you will be in the state penitentiary"; that the state court imposed a sentence of from 14 to 28 years, and petitioners were returned to the Caddo Parish jail; and that they then learned that their wives had been arrested by the Federal authorities to await the action of the grand jury.

Further, that prior to October 11th, being without means, they requested Hardin

to "appoint counsel to represent them", as they did not intend to plead guilty to the Federal charge; that said assistant U. S. Attorney told them, "you can not plead not guilty in the Federal Court. You have already plead guilty in the state court to this charge and hence your right to be represented by counsel is waived. * * * We have your confession and your guilty plea and judgment in the state court * * * If you enter a plea of not guilty in the federal court and give me any more trouble you are going to get the limit and be sent to a federal penitentiary. But otherwise you will get a light sentence and it will run concurrently with the state sentence which you now have. * * * It is not our intention to send you boys to federal penitentiary. You have already received a sufficient sentence in the state court. You will only be taken into the federal court and sentenced for a matter of record. To plead not guilty you will not only be foolish but it would be hard for your wives". And that because of these representations, they finally plead guilty in this Court on October 25, 1938, and were sentenced to serve 15 years, to run concurrently with the state sentence previously imposed.

The government denied all the allegations of coercion and other charges of misconduct by federal officers, and offered evidence to prove that on July 27, 1938, the agent of the Federal Bureau of Investigation, Jas. O. Peyronnin, "in the company of deputy sheriff Hough of Minden, La., questioned Harry and Truman Mahoney" after they had been arrested for the robbery of the bank on June 9th, while they were confined in the Caddo Parish jail under the state charges. At about 4:30 in the afternoon of July 27, 1938, Harry Mahoney stated to the agent that he "would talk and tell the truth about the bank robbery if special agent Peyronnin would bargain with him". Special agent Peyronnin thereupon asked Harry Mahoney what he meant by bargaining with him. Harry Mahoney said, if his wife and the wife of Truman Mahoney would be released and not prosecuted, and he be given positive assurance in that respect, he would talk; that special agent Peyronnin then informed Harry Mahoney that he had no authority whatever to make him any promises and his request would have to be referred to assistant U. S. Attorney, J. Fair Hardin, who was handling the prosecution for the government; that Hardin was contacted and informed of Harry Mahoney's request;

that Hardin proceeded immediately to the jail and informed Harry and Truman Mahoney in the presence of Peyronnin and deputy sheriff Hough that if he, Harry Mahoney and Truman Mahoney, his brother, would give a detailed statement of their participation in the robbery of the Minden Bank, and would restore all the money stolen and property which they had purchased with the stolen loot, he would not institute prosecution against the wives of the two Mahoneys; that the statements should be written and signed and the money and property restored before he, Hardin, would authorize the release of the wives of the Mahoneys; that the agent had previously informed Hardin that the wives of the petitioners had violated the National Stolen Property Act and that he, Hardin, had authorized the institution of the prosecution therefor against the said wives for receiving and transporting the stolen property in interstate commerce; and that as a consequence "on the evening of July 27, 1938, Harry and Truman Mahoney carefully dictated * * * to Peyronnin, in answer to questions by said agent, a detailed statement of their entire activities in connection with the robbery of the Minden Bank of June 9th, 1938, and in which they implicated Frank Denman and Frank Denman's wife"; and on July 30, 1938, both petitioners "read the typewritten statements which they had given * * * which they signed in the presence of their wives * * * and in the presence of Frank Denman as well as deputy sheriff, P. M. Hough and agent Peyronnin"; that Peyronnin took the said statements in shorthand which he transcribed; that the said petitioners "thanked Peyronnin in the course of his investigation for the many courtesies extended to them during the progress of the investigation"; that on September 10, 1938, petitioners were brought before the state court for arraignment, at which time the state court appointed Jas. E. Bolin counsel for one of the Mahoneys and C. P. Campbell for the other; that petitioners entered pleas of not guilty and the trial was set for October 4th following. At the same time they were arraigned for the bank robbery they were also arraigned upon another charge of burglary and the same attorneys were named to represent them. Further, that on September 25, 1938, petitioners "attempted to escape by breaking out of the Caddo Parish jail" while being held under both state and federal charges; that

on October 11th, petitioners entered pleas of guilty to the state court charges and were sentenced to serve from 14 to 28 years; that on October 11, 1938, they were indicted under the Federal Escape Statute, and for conspiracy to commit the same act; that on October 26th, following, petitioners plead guilty to the indictment charging them with violation of the National Bank Robbery Statute, and were sentenced to 15 years, to run concurrently with the sentences imposed in the state court; that on the same day they also plead guilty to the charge under the Federal Escape Act and the imposition of sentence was deferred until they completed the sentence for bank robbery; that during all said proceedings, petitioners were advised of their constitutional rights and that at no time did any federal agent or attorneys coerce or threaten them in any respect, and the said petitioners were fully advised of the nature of the charges against them. That when petitioners were arraigned in this Court they were "loaned" to the Federal authorities for the taking of their arraignments, pleas, and sentences, "with the understanding and agreement * * * that they were to be returned to state custody", which was done.

That on March 19, 1939, petitioners wrote a letter to agent Peyronnin "requesting that he visit them at the Louisiana State Penitentiary, because they desired to 'come clean' regarding other federal insured bank robberies, which at the time were unsolved; that Peyronnin visited petitioners at the state penitentiary and obtained a statement from them regarding their participation in other crimes"; that this was approximately six months after their pleas of guilty in this Court and that neither made any mention of having been deprived of their rights at the time of sentence, nor did they mention anything whatever of having been coerced into having made statements, but "on the contrary at that late period of time the said Harry and Truman Mahoney made additional voluntary statements of their participation in many crimes and also touched on the robbery of the Minden Bank & Trust Co. of Minden, Louisiana."

On the trial of the motion the Government also called as witnesses the attorneys who had represented the petitioners in the state court, who were permitted to testify over objection of counsel presently representing them, that the communications between attorney and client were privileged. The reason for permitting this was, as stated by the Court at the time, that the petitioners were not on trial on the merits, but the important issue was the bona fides of their present contention and the weight to be given to their statements made some three years after they had been sentenced.

Attorney Campbell testified that when the accused were arraigned in the state court the judge inquired of them if they had attorneys, to which they replied they had not because they had no means to employ counsel, at which time, he and Jas. E. Bolin, another attorney, were appointed to represent Truman and Harry Mahoney respectively; that upon each occasion the witness talked to Truman Mahoney, the latter maintained his innocence and claimed that he was not in the state of Louisiana at the time the Minden Bank was robbed. "I forget exactly where he said he was now, but he said he could prove he was not within the limits of the State of Louisiana at the time the bank was robbed." Harry Mahoney was present at each conversation, as was his attorney, Mr. Bolin; that when they were arraigned, as the witness recalled, they asked for attorneys to be appointed to represent them and for this reason they were pleaded not guilty that morning and the witness talked to them later that day. "Then, later, I came to Shreveport and talked to them in the Shreveport jail. I was appointed to represent Truman Mahoney on September 10, 1938."

"* * * On October 11, 1938, Harry and Truman Mahoney came to Minden and advised Mr. Bolin and me that they had decided to withdraw their former pleas and enter new pleas of guilty for the reason they felt they would get lighter sentences by doing so." During the time the witness and Bolin represented the petitioners, "they asked us if they could be charged in the Federal Court with this crime, and we told them that if the accounts were guaranteed by the Federal Deposit Insurance Corporation, they were subject to being charged in the Federal Court also". Campbell advised that if they had violated both the state and Federal law they could be prosecuted in both courts. During these conversations they made no complaint about any coercion of the assistant U. S. Attorney, J. Fair Hardin. Neither did they mention anything about the F. B. I. agent, Peyronnin. The witness was informed by deputy sheriff Hough that the petitioners had made a statement to the F. B. I. agent before they entered their pleas of guilty. He did not see this statement until a year

or two later. He did not represent either one of them in the Federal Court, nor did he advise them that they were entitled to counsel in that court.

Attorney Bolin's testimony was substantially the same as that of Campbell, and in addition, he stated that "my opinion about it is that they were well versed in the matter and in the law. In fact, they surprised me at times". He was asked and answered questions by the attorney for the Government as follows:

"Q. Did you discuss with them anything about a statement that they had given the F. B. I. relative to their participation in the Minden bank robbery? A. As well as I remember I think I did. It seems to me that when we were up there in the Caddo Parish jail, and I think we were both up there at the time, Mr. Campbell and I— anyway I considered myself as helping to represent both of them, because Mr. Campbell and I were representing both of them, and they discussed about—one of them discussed about being in the jail asleep at the time the bank robbery was committed, or some jest like that, and if I recall it correctly, I asked them if that was true why in the world they signed that big long confession admitting that they . had taken part in it themselves.

"Q. What did they say about that? A. I don't remember. I just don't remember it all, but I do remember having heard about this confession, and when they made that statement I just asked them that question, and I have forgot what their answer was now.

"Q. Did they ever tell you anything about any coercion? A. No, sir. The only thing that I can remember that was mentioned in that connection was that one of them up in the Caddo Parish jail laughed and said something about that deputy at Shreveport, Mr. Newberry, I believe was his name—he laughed and said, 'I believe he would kill you, wouldn't he?'

"Q. Did they complain to you about the then Assistant United States Attorney, Mr. J. Fair Hardin, coercing them in any way? A. I don't remember his name ever being mentioned.

"Q. Did they mention the name of Mr. J. O. Peyronnin, F. B. I. agent? A. No, sir.

"Q. Did they ever mention Mr. P. M. Hough, Deputy Sheriff of Webster Parish? A. No, sir.

"Q. Did they say anything to you at any time that indicated that Mr. Hardin, Mr. Hough, Mr. Peyronnin, or anyone else had coerced them into doing anything? A. No, sir."

The testimony of these attorneys was taken contradictorily with the counsel appointed for them by this Court, February 16, 1942, the day set for the hearing, the affidavits and testimony of the petitioners not having been taken, but because these witnesses were about to go into the army, and it would have been difficult to reach them later. Subsequently, on June 29, 1942, the matter was taken up and completed. At that time the attorney for .the Government filed a plea to the jurisdiction. At the same time counsel for the petitioners stated in open court they wished to "dismiss this plea (motion to correct judgment) insofar as it relates to any matters after these two defendants were sentenced."

▇▇▇ As to the plea to the jurisdiction I am of the view that a motion of this kind, in view of the allegations of coercion and the fact that the term at which they were sentenced had expired approximately three years before filing of the complaint, makes no difference. Authorities in support of this view are cited in the former opinion as to their rights to be present in person. While the petitioners, through their counsel, have the right to abandon in court any relief which they may originally have claimed, the Court may, I believe, consider any subsequent facts or conduct on the part of the petitioners, which throws light upon the bona fides of their statements. The assistant District Attorney, J. Fair Hardin, who handled the matter when these petitioners entered their pleas and were sentenced in 1938, and who is charged with much of the misconduct and coercion, had died long before the motion was filed, and, of course, can not refute those charges. These facts, also proved by the Government, are undisputed: Peyronnin had been in the service as an agent for the Bureau of Investigation for some 25 years; he came into the investigation of this case on July 13, 1938, after it had been started by other agents. At that time, the case had not been "broken" and the petitioners had not been arrested. He returned to Minden on July 25, following, and was informed by Mr. Harper, president of the bank, that the case had been broken and he later referred the witness to sheriff Haynes of Webster Parish and his deputy,

Mr. Hough. The latter informed Peyronnin that one Denman had made a statement of what had taken place prior to the robbery of the bank; witness interviewed Denman and the latter made a voluntary signed statement. The Mahoneys were arrested in Arkansas while the witness was in Minden. Peyronnin identified statements made by the two petitioners, respectively, on July 29, 1938. These statements recited at length what had happened and were signed by the petitioners. Without going into details of his testimony it is sufficient to say it refutes completely the claims of the petitioners as to having been told they could not have an attorney and they would not be prosecuted in the Federal Court if they confessed.

If these petitioners were shown to be inexperienced, there might be some plausibility in the statements that they were induced to confess and enter pleas of guilty, inasmuch as they had maintained their innocence to their attorneys, who were appointed at their request by the state court, until they were brought to Minden at the time they pleaded guilty. However, as testified to by the attorneys appointed to represent them, not only was no suggestion made of anything improper having taken place, such as threats or coercion which, according to their own stories, was before they pleaded guilty in the state court, but the attorneys were surprised at the familiarity of the petitioners with legal procedure. It also appeared that they had engaged an attorney in Arkansas where they were first arrested, who wrote letters to the assistant district attorney of this Court, and made a visit to Shreveport to see Hardin, but found him out of the city. This was also before the pleas were entered. The Arkansas attorney then wrote stating that the Mahoneys had said Hardin had informed them he would not prosecute them in the Federal Court if they pleaded guilty in the state court. Immediately on receipt of this letter, Hardin wrote this Arkansas lawyer, denying any such promises, reciting in detail what had taken place, and sent the Mahoneys copy of his letter. They then wrote Hardin acknowledging receipt of this copy, saying in part:

"I told Mr. Montgomery (the Arkansas lawyer) that the Federal said they would drop charges against us, and it is certainly true. I quote Peyronnin to Montgomery and I quote Peyronnin now 'We do not wish to prosecute you. If the state tries you and gives you a substantial sentence we have no further interest. This is all just a formality.

"At no time have you ever stated that in my presence the Federal would have the finger on us. In fact, I ask you. Do you say 'Yes'? * * * Did you try to discourage our attorneys?"

This was signed by Truman Mahoney and, continuing on the same page, Harry Mahoney wrote about other matters, including stolen bonds, which the statements given on July 27th said had been burned. Assistant district attorney Hardin then addressed a letter to both the petitioners, in which he detailed at length what had transpired and among other things said:

"Mr. T. R. Mahoney
"Mr. Harry H. Mahoney
  "Caddo Parish Jail
  "Shreveport, Louisiana
"Sirs:

"I received your letter of August 28th replying to the copy of a letter which I wrote to Mr. Sam E. Montgomery under date of August 20. It is true that in my letter to Mr. Montgomery I used the word 'they' in referring to statements of both of you without distinguishing as between the statements of Truman Mahoney and Harry Mahoney. However, you were both definitely questioned together about the bonds and other securities that were stolen, and Harry Mahoney definitely stated in the presence of Truman Mahoney that all of the securities were burned in the kitchen stove at the Denmans. Harry Mahoney was bound to have known that this was not a fact. Of course, I have no way of knowing positively that Truman Mahoney likewise knew that this was not a fact, but in view of the close association of both of you, the fact that you are brothers, and your statements that you kept your money together, I have every reason to believe that Harry Mahoney kept Truman Mahoney advised of every move that was made with reference to the stolen securities.

"I have never at any time even suggested that the Federal government would not prosecute you for the robbery of the Minden bank. I was present during the whole time that you both made your statements, and at no time did Mr. Peyronnin ever make any such statement to you and I do not believe that he made such a statement as you say he made out of my presence.

You at no time asked me whether the federal government was going to prosecute you or not. You did ask me what the limits of punishment were under the federal act and what the limits of puinshment were under the state act, and you told me that you preferred to be prosecuted by the State Court because you thought you had a better chance of being paroled.

"I turned over to Truman Mahoney's wife everything that I brought back in the nature of personal property from Arkansas with the exception of certain photographs and photograph negatives, and I explained to Mrs. Mahoney, and I state to you, that these will be returned to you as soon as the F. B. I. is through with them. They are being used solely in an effort to locate and identify your associates and your missing co-defendant, Dan Davis.

"With reference to the tin box containing papers belonging to Harry Mahoney, I at no time made any agreement with reference to the contents of that box. Mrs. Mahoney told me that I would find the key to the truck in that box and that the box was in the dressing table drawer at their home. It happened that I went to the headquarters of the Arkansas State Police and by mere chance mentioned that I was going to get the Chevrolet truck, and the Assistant Superintendent of Police asked me if I had the key to the truck and I told him that Mrs. Mahoney had stated that it was in this tin box. He stated that they had gotten the tin box and had it in the office, and they turned it over to me and there I found the key. Otherwise I would have had a useless trip to Sheridan, Arkansas as far as the truck key was concerned. When I looked into the box I found that it contained a number of documents, some of which may contain information that will be of assistance in the investigation of this charge. I have explained to Mrs. Mahoney and I state to you that although I am under no obligation whatever to turn the contents of this box over to you, I fully intend to do so as soon as the F. B. I. has completed its investigation. I have no desire to and I will not keep anything belonging to you.

"You asked me the question and I again state to you that I have been entirely fair with you and have carried out every agreement that I made with you."

All these letters were written in August and September, the last on September 1, 1938. At that time, the indictment in this court for robbing the bank had not been returned, but was filed on October 26 following, at which time the petitioners were arraigned and the pleas entered. This was nearly three months after the written confession had been signed and almost two months after they had been put on notice that no promises had been made or would be kept that they would not be prosecuted in this court if they pleaded guilty in the state court. In the meantime, their wives had tried to help them escape from the Caddo Parish jail, but were apprehended, convicted and sentenced to prison, not for any part in the bank robbery, but the attempted jail breaking.

The sentence of this court was made to run concurrently with that of the state court. They were taken to the state penitentiary and on March 29, 1939, a little more than four months later, they wrote Peyronnin from the state prison as follows:

"Mr. Peyronnin
    "Federal Bureau of Investigation
    "Department of Justice, New Orleans, Louisiana.

"Dear Sir:

"At your earliest convenience, if possible, we would like to have a visit with you, concerning possible arrangements for a release from the State of Louisiana to the Federal Government.

"Subsequent to such a transfer we desire to come clean regarding other Federal insured bank robberies in which other participants are yet untried and at large. We believe this will safeguard ourselves against the possibility of prosecution at the time and when we are finally released.

"We are incarcerated with others involved and unless assured of removal we shall not disclose what will surely point to us. We are sincerely,
    "Very Respectfully yours,
        "H. A. & T. R. Mahoney,
        "Angola, Louisiana, Camp E."

It thus appears that they were anxious to be released to the Federal authorities, and if so, they would "come clean regarding other federal insured bank robberies". Not a word of complaint was made of any coercion or misrepresentation about the right to have counsel. About a month later Peyronnin went to the state penitentiary, where petitioners were brought out by the warden for an interview, but they refused to talk unless they were turned over to the fed-

eral authorities. Thereupon, the warden, in their presence, told Peyronnin that he would turn them over with about 28 other prisoners to the Federal Government, and told petitioners to "go ahead and tell Mr. Peyronnin everything", which they did and Peyronnin took their statements in shorthand, about other crimes, which were principally in Indiana and Illinois, transcribed the same, brought them back and they were signed by the petitioners. At that time they said nothing about having been coerced or told they could not have an attorney at their trial in this court, but according to Peyronnin, "thanked me for the nice way in which I had treated them and their wives at that time." Otherwise their conduct indicated no thought of having been mistreated. This interview was in April and the prisoners were turned over to the U. S. Marshal on May 19, 1939, the commitment having been issued on May 5th, and on the 22nd of that month they were delivered to the Federal penitentiary at Leavenworth, Kansas.

On February 24, 1941, the petitioners addressed to the warden of the Louisiana penitentiary a letter stating that there was on file in the office of the warden of Alcatraz penitentiary, a communication from the Louisiana warden requesting that he be informed of petitioners' release, "for extradition back to Louisiana to serve the 14 to 28 years we received on October 11, 1938", and saying it was their (petitioners') opinion that "our release to Federal authorities terminated the state sentence". The Louisiana warden replied on March 3d advising petitioners that when the Federal authorities were through with them, steps would be taken "to return you to this jurisdiction". On March 12, following, petitioners addressed the judge of this court a letter complaining of the fact that the State of Louisiana was asserting its right to bring them back at the end of their present sentence. They wound up with the inquiry:

"Hon. Ben C. Dawkins,
   "Federal Building, Shreveport, La.
"Dear Sir:
   "This letter is meant to get your Honorable intentions of Judgment concerning the case: The United States v. Harry and Truman Mahoney; and also to beg your Honorable opinion whether equity has or has not been maintained in the course that judgment has taken.

"On October 26, 1938 the above named defendants entered your Court and on a plea of guilty to bank-robbery were sentenced to fifteen years which was to run concurrently with a sentence of from fourteen to twenty-eight years which the defendants were then presently serving in the Louisiana State Penitentiary for the same charge.

"Before imposing sentence we recall that you said, in part, similarly: You have been given long sentences for this crime in the state court; and it is not the design of this court to lengthen that sentence, or to give you additional time to serve. But, due to the laxness of the parole system in this state, this court must impose a sentence which will run concurrently with the State sentence; to make certain that a reasonable portion of the State sentence is served.

"We were subsequently committed to the Louisiana State Penitentiary to serve the two sentences concurrently.

"On May 2, 1939, by an order of the then Governor of The State of Louisiana we were turned over to United States Authorities on a 'so-called reprieve' to serve a sentence which was 'pending' against us. (Quoting the above from the record of The Louisiana State Penitentiary).

"In a recent letter from the Warden of The Louisiana State Penitentiary, he writes, '* * * it has been held that such a release is illegal, and the Attorney General has ruled that inmates so released could not be credited on their State sentence with time served in Federal prison. This office accordingly has no choice but to maintain the detainers already in force, and to take such steps as may be necessary to return you to this jurisdiction whenever the Federal authorities release you.'

"It seems to follow that we are committed to serve fifteen years in a Federal penitentiary, and then serve fourteen to twenty-eight years imposed by the State; which, is not in accord with either the state or the federal sentence.

"In addition to the fifteen years we received for bank-robbery you also imposed a sentence of three years on another charge, which, (quoting the minutes of The Court), 'imposition of sentence be deferred * * * until and after they have completed the sentence imposed against them in case No. 9033.' However, it is our recollection that the sentence of three years was suspended.

"We would in consequence feel the utmost appreciation if you would so kindly advise us whether it is legally possible to be recommitted to the Louisiana State Penitentiary to serve the sentence imposed by the state and also at the same time serve the Federal sentence as was so laid down by both courts.

"Very respectfully yours"

This court replied that it had "no control over the course pursued by the state authorities or what they may do in the future." This was followed by the long and somewhat contradictory motion filed in this court and sworn to on June 6, 1941."

Considering the circumstances and facts partially detailed herein, it seems rather clear that the decision to file this motion with its serious charges was reached only after disappointment flowing from the insistence of the state authorities that the petitioners would have to be brought back to finish the state sentence. It is hardly probable that these defendants with the long criminal record disclosed by the Federal Bureau of Investigation, resulting from comparison of their finger prints, could be readily taken advantage of in the manner which they claim. That record as disclosed by the F. B. I. report is as follows:[1]

---

[1] No. 1—Truman Mahoney.

| | | | | | |
|---|---|---|---|---|---|
| PD, Terre Haute, Ind. | Truman Mahoney | #4466 | 8–19–27 | Burglary s. s. Ind. Ref. |
| SRef, Pendleton, Ind. | " | " | #17324 | 12– 4–27 | Burg 2nd deg one to 10 yrs. |
| PD, Shreveport, La. | " | " | #8483 | 2– 5–30 | Suspect Released |
| PD, Terre Haute, Ind. | " | " | #4703 | 10–20–30 | Vio. Par. Ret. to SRef. |
| PD, Terre Haute, Ind. | " | " | #7623 | 10– 1–34 | Fed. invest. 3 yrs. Fed. Pen. vio. Dyer Act. |

Has been before the probation officer at Terre Haute, Ind. for truancy and delinquency.
1923, Terre Haute, Ind. for stealing horses, released probation officer.

#8483, P.D., Shreveport, 8–19–30 inv., released.
USP, Atlanta, Ga. Truman Richard Mahoney, #45901, 4–9–35 vio. Nat. Motor Veh. Act 3 yrs. 7–13–37, cond. rel.
SPol., Little Rock " " " 7–28–38 fug. (susp. bank robbery)
#74226 rel. tp. S. O. Minden, La.
SO, Shreveport, La. Truman Richard Mahoney 7–25–38 bank robbery.
#174

---

No. 2—Harry Mahoney.
PD, Terre Haute, Ind. Harry Mahoney, #5321 10–17–29 murder
PD, Shreveport, La. " " #8475 2–5 –30 suspect
9–16–30, rel. on charge of susp.
PD, Lafayette, Ind. " " #997 3–14–30 inv.
" 1930, Terre Haute, Ind., as fug.; turned over to Marion Co., Ind., for R.S.G.; fined $100 and costs susp. and sent to St. Farm for 6 mos.

SF, Greencastle Harry Mahoney #50393, 12–24–30 vehicle taking and unlawful poss. 6 mo. $100 fine, $12.35 costs
*served 4 mo., 27 das. & discharge.

As 997, Lafayette, Ind., 12–21–32, found guilty by jury, manslaughter; sent. 2 to 21 yrs. Ind. S. R.
S.Ref., Pendleton Harry Mahoney #22990 12–22–32 manslaughter 2 to 21 yrs.
S Pol., Little Rock " " #74225 7–25–38 Fug. (susp. bank rob.)* rel. to SO, Minden, La.
SO, Shreveport, La. " " #1762 7–28–38 bank robbery
USM, Shreveport, " " #262 7–26–38 robbing Minden Bk. & Tr. Co., Minden, La.
*1919, Terre Haute, Ind., for truancy; rel.
1929, Terre Haute, Ind., for shooting man; exon. by coroner.
1930, Lafayette, Ind., for improper license plates; rel.
1931, Shreveport, La., for inv.; rel.

This court, I believe, has the right to take cognizance of its invariable practice of having persons accused, arraigned in open court by the United States Attorney or his assistant who handles the case; and it also requires the agent of the Department, which made the case, to be sworn at the time and to make a statement of the facts concerning it in the presence of the accused; that it invariably inquires if the prisoner understands the charge, and if so, whether he wishes to plead guilty or not guilty. For the last two or three years, in view of the many applications for habeas corpus filed in the courts having jurisdiction of Federal prisons, this court has informed the accused before he is permitted to plead, that he is entitled to be represented by counsel of his own choosing, if financially able, and if not, that one would be appointed, but at the time this case was disposed of, this practice had probably not been inaugurated, although the court was careful to ascertain to the best of its ability that a plea of guilty was freely and understandingly entered.

For the reasons above given I am of the view that the motion to correct the sentence and judgment should be and it is accordingly denied.